*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* S. M. RICHARDS, Minor.

UNPUBLISHED
July 21, 2026
1:33 PM

Nos. 378023 & 378576
Lapeer Circuit Court
Family Division
LC No. 24-013296-NA

Before: MARIANI, P.J., and O'BRIEN and WALLACE, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-mother and respondent-father appeal as of right the order terminating their parental rights to the minor child, SMR. Respondents assert the same arguments on appeal, claiming that the trial court erred when it found (1) statutory grounds for termination under MCL 712A.19b(3)(c)(*i*), (g), and (j) and (2) that termination of respondents' parental rights was in SMR's best interests. We affirm.

## I. BACKGROUND

Respondents have a history of domestic violence. In December 2024, respondent-father lived in a tent in the woods, and respondent-mother was staying at a women's shelter for domestic-violence victims. One night, respondent-mother left the shelter and brought SMR—who had a severe cough and double ear infection—to respondent-father's tent, where the three slept overnight while it was about 37 degrees Fahrenheit outside. In the morning, respondents got into a loud argument, and when law enforcement arrived, they found SMR in a car seat outside the tent in the snow, not wearing shoes. Respondent-father was eventually arrested for domestic violence and taken to jail. SMR was taken into protective custody and placed in foster care after it was determined that respondent-mother was unable to care for him.

---

[1] *In re SM Richards Minor*, unpublished order of the Court of Appeals, entered February 18, 2026 (Docket Nos. 378023 and 378576).

The court took jurisdiction over SMR in January 2025 after respondents entered no-contest pleas. In the ensuing months, respondents barely complied with their treatment plans. As a result, at a May 2025 dispositional review hearing, respondents were told that they needed to do "a lot more moving forward." Unfortunately, respondents' sluggish progress continued through to the next dispositional review hearing in August 2025. At that hearing, the Department of Health and Human Services (DHHS) requested permission to file a petition to terminate respondents' parental rights due to their lack of progress. The court granted the request while noting that respondents could still participate in services and work towards removing the barriers to reunification.

By the time of the termination trial in October 2025, respondents had still done little to remove their barriers to reunification. Respondent-mother had obtained housing but was still struggling to address her issues with domestic violence, substance abuse, and mental health. Respondent-father had not made any progress on removing his barriers to reunification. As a result, the trial court found statutory grounds for termination under MCL 712A.19b(3)(c)(*i*), (g), and (j). The court also found that termination of respondents' parental rights was in SMR's best interests, so respondents' parental rights were accordingly terminated.

This appeal followed.

## II. STATUTORY GROUNDS

On appeal, both respondents first dispute the trial court's finding that statutory grounds for termination were proven by clear and convincing evidence.

## A. STANDARD OF REVIEW

A trial court must find at least one statutory ground for termination under MCL 712A.19b(3) has been proven by clear and convincing evidence to terminate parental rights. *In re Sanborn*, 337 Mich App 252, 272; 976 NW2d 44 (2021). This Court reviews for clear error a trial court's statutory-ground finding. *Id*. A finding is clearly erroneous if this Court is left with a definite and firm conviction that a mistake was made. *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

## B. APPLICABLE LAW

The trial court found statutory grounds to terminate respondents' parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). Those subsections provide that a trial court may terminate a parent's parental rights if the court finds by clear and convincing evidence that:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

-2-

\* \* \*

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent.

The court need find only one statutory ground for termination to terminate parental rights. *In re Sanborn*, 337 Mich App at 272. Consequently, this Court will affirm "[i]f the trial court did not clearly err by finding one statutory ground existed." *Id*. at 273.

## C. RESPONDENT-MOTHER

We conclude that the trial court did not clearly err when it found by clear and convincing evidence that termination of respondent-mother's parental rights was proper under MCL 712A.19b(3)(c)(*i*). The initial dispositional order was entered on February 14, 2025, so by the time that respondent-mother's rights were terminated in October 2025, more than 182 days had passed since the issuance of an initial dispositional order.

The conditions that led to respondent-mother's adjudication included inappropriate housing, domestic-violence concerns, abuse of drugs and alcohol, concerns about respondent-mother's ability to safely parent SMR, and mental-health issues. Since her adjudication, respondent-mother obtained housing, but all the other issues that led to respondent-mother's adjudication remained.

For substance abuse, the court reviewed respondent-mother's history of drug testing and observed that she had "49 non-compliant tests, and numerous other tests with some other issues in there," such as testing positive for prescription medication that she was not prescribed. Respondent-mother also had "multiple tests for alcohol." One of those positive tests was as recent as August 2025. The court noted that respondent-mother had been offered services to aid her in addressing her substance abuse, including a referral for "Substance Use Disorder" programming (SUD). According to SUD, however, respondent-mother had made "minimal progress towards her goal of abstaining from alcohol consumption" and "living a lawful lifestyle." The court further noted that respondent-mother had attended "Sacred Heart"—a rehabilitation facility—for "nine days" but ultimately "[l]eft against recommendations." On this record, the court concluded that respondent-mother had "not rectified the substance abuse issues that led to her adjudication."

For respondent-mother's mental health, the court noted that respondent-mother participated in a psychological evaluation but "was extremely guarded" for it, meaning that she "was not open and forthright," which hampered the psychologist's ability to aid respondent-mother in "address[ing] the issues." Despite this, it was recommended that respondent-mother attend

individual therapy to help her address her "deep[er]" issues, which respondent-mother initially participated in. She was, however, "still very guarded" during the sessions. The court concluded that respondent-mother's mental health remained a barrier because she was not "receiving much benefit from this counseling that she's doing."

Turning to domestic-violence concerns, the court labeled this as "one of the foremost things" that respondent-mother needed to address because it was what "first brought this [case] into attention." The court found that this issue was "significant" but does "not appear" to have been "ever addressed at all by" respondent-mother. The court noted that respondent-mother continued to see respondent-father, continued breaking the no-contact order of both her probation and respondent-father's probation, and continued to engage in domestic violence. The court noted that the most recent example was when respondent-mother was arrested for domestic violence as a result of an incident involving respondent-father in August 2025. The court concluded that it had this case "for eight months," and respondent-mother was still dealing with the same issue that she was "at the beginning."

For parenting skills, the trial court observed that respondent-mother had worked with multiple services but was unable to address her issues. Respondent-mother worked with "Family Preservation" but was "closed out" due to "lack of progress, lack of communication." She later signed up for "Love and Logic" "in April[] but did not attend." She signed up for the class again later and this time attended, but she "was asked to leave on the last night of the class due to her inappropriate behavior." Respondent-mother did end up completing the program, but "it [was] said that she did not benefit." The court summarized that respondent-mother was "not benefitting from the [parenting] programs" in which she participated, explaining that "just because you sit there doesn't mean you benefit from [being] there." As for parenting time, the court noted that respondent-mother "had some good parenting time, but it's been back and forth." But the court commended respondent-mother on her recent parenting time, acknowledging that "it's gone better lately," though the court caveated this by also acknowledging that there still "has been some cancellations and some missed parenting times." The court was also "concerned" that respondent-mother failed to attend SMR's surgery because she "didn't have transportation."

After concluding that respondent-mother had failed to rectify these conditions that led to termination, the court next considered whether there was a reasonable likelihood that respondent-mother could rectify the unresolved conditions in a reasonable time considering SMR's age. The court noted that SMR was 26 months old at the time of the termination trial and had been in foster care for 10 months. In that time, respondent-mother, in the court's opinion, had "made little, if any, progress in addressing the main reason the court took jurisdiction over the child," despite being "told multiple times in court how to address these things." The court ultimately relied on that lack of progress as well as respondent-mother's "lack [of] insight, unwilling[ness] to take responsibility, [and] continued poor decisions" to conclude that respondent-mother would not be able to rectify the conditions that led to adjudication in a reasonable time considering SMR's age.

Respondent-mother on appeal contends that by the time of her termination trial in October 2025, she had in fact rectified all of the conditions that led to adjudication except her substance abuse. As explained, the trial court concluded that, by the time of the termination trial, respondent-mother had appropriate housing but still had not addressed her issues with substance abuse, domestic violence, mental health, and parenting skills. Respondent-mother does not contend that

-4-

any of the trial court's underlying factual findings in support of its conclusions were clearly erroneous. She instead merely contends that the facts as found by the trial court do not support that the conditions remained unrectified.

For mental health, respondent-mother emphasizes that she completed a psychological evaluation and attended therapy. And for parenting skills, respondent-mother similarly emphasizes that she "engaged in parenting education as directed by DHHS." Both assertions are true, and the trial court acknowledged as much. The trial court concluded that respondent-mother's mental health and parenting skills remained a barrier to reunification because respondent-mother had not benefited from the services in which she engaged. Respondent-mother does not dispute these findings, and they establish that respondent-mother's mental health and parenting skills remained barriers to reunification, as the trial court found.

For domestic violence, respondent-mother acknowledges that she was arrested for a domestic-violence incident involving respondent-father two months before the termination trial, but she insists that domestic violence was no longer an issue for her by the time of trial. Since this case began, respondent-mother was offered services to help her address her issues with domestic violence that primarily involved respondent-father. Despite this attempted intervention, respondent-mother was arrested for a domestic-violence incident involving respondent-father two months before trial. We are not convinced that, on such facts, the trial court made a mistake by finding that respondent-mother's struggles with domestic violence had not been rectified by the termination trial.

Respondent-mother also argues that the trial court clearly erred by finding that respondent-mother could not rectify her struggles with substance abuse, parenting skills, and mental health in a reasonable time considering SMR's age.[2] Starting with respondent-mother's substance abuse, respondent-mother again emphasizes that she participated in services offered to her. The trial court, however, acknowledged respondent-mother's participation in substance-abuse services but concluded that she was either not completing the services (like when respondent-mother left Sacred Heart early against the provider's recommendation) or was not benefitting from the services (like how SUD stated that respondent-mother had made "minimal progress" towards her goals). Respondent-mother's ongoing struggle with substance abuse was exemplified by the results of her drug screenings—she had "49 non-compliant tests" that included "multiple tests for alcohol," including as recently as August 2025. Given respondent-mother's lack of progress and either

---

[2] Respondent-mother does not explicitly make this argument with respect to domestic violence because she believes that she sufficiently "addressed" this barrier to reunification. For thoroughness, we note that if respondent-mother had made this argument with respect to domestic violence, we would reject it. Considering that (1) respondent-mother was offered services to address her issues with domestic violence since the case began and (2) she failed to make any meaningful progress towards addressing her issues with domestic violence (culminating in her arrest for domestic-violence incident involving respondent-father a mere two months before the termination trial), we are not convinced that the trial court clearly erred by finding that there was not a reasonable likelihood that respondent-mother could address this barrier in a reasonable time considering SMR's young age.

unwillingness or inability to benefit from the services offered, the trial court properly found that there was not a reasonable likelihood that respondent-mother could address her struggles with substance abuse within a reasonable time considering SMR's age.

For respondent-mother's mental-health issues, she again emphasizes her participation in services but ignores that the trial court was concerned about the fact that respondent-mother had not benefited from the services in which she engaged. On that point, the trial court noted that respondent-mother was "guarded" in her therapy sessions and during the psychological evaluation, which supported the court's finding that respondent-mother "lack[ed] insight" into how to properly address her mental-health issues despite being "told multiple times in court how to address these things." It also supported that respondent-mother was "unwilling to take responsibility" for her mental-health issues and address them in a way that made reunification with SMR possible. All of this supports the trial court's finding that there was not a reasonable likelihood that respondent-mother could address her mental-health issues in a reasonable time considering SMR's age, and we are not convinced that this finding was erroneous.

The same largely holds true for respondent-mother's lack of parenting skills. Again, respondent-mother engaged in services to help her develop better parenting skills, but she failed to sufficiently benefit from those services. This issue is perhaps a closer call because the trial court found that respondent-mother's parenting-time sessions had recently improved, but it is also true that respondent-mother had still not progressed to unsupervised visits due to concerns with her parenting ability despite having received services for months. Ultimately, it is unnecessary to decide this particular sub-issue because, regardless of whether respondent-mother could have developed the skills necessary to safely parent SMR in a reasonable time considering SMR's age, the other barriers to reunification remained, and the trial court properly found that there was not a reasonable likelihood that respondent-mother could rectify those barriers in a reasonable time given SMR's age.

To summarize, we conclude that the trial court did not clearly err by finding that termination of respondent-mother's parental rights was proper under MCL 712A.19b(3)(c)(*i*). More than 182 days had elapsed since respondent-mother's initial dispositional order was issued, and the trial court did not clearly err by finding that (1) the conditions that led to adjudication (domestic violence, substance abuse, and mental-health concerns) continued to exist and (2) there was not a reasonable likelihood that respondent-mother would be able to rectify these barriers to reunification in a reasonable time considering SMR's young age.

Having concluded that termination was proper under MCL 712A.19b(3)(c)(*i*), we need not address the other statutory grounds on which the trial court relied to terminate respondent-mother's parental rights.

D. RESPONDENT-FATHER

Like with respondent-mother, we conclude that the trial court did not clearly err when it found by clear and convincing evidence that termination of respondent-father's parental rights was proper under MCL 712A.19b(3)(c)(*i*). The initial dispositional order was entered on February 14, 2025, so by the time that respondent-father's rights were terminated in October 2025, more than 182 days had passed since the issuance of an initial dispositional order.

The conditions that led to respondent-father's adjudication were largely the same as the conditions that led to respondent-mother's adjudication—inappropriate housing, domestic-violence concerns, substance abuse, and mental-health issues. The trial court found that respondent-father had failed to rectify all of these conditions by the time of the termination trial, and respondent-father does not appear to dispute that finding on appeal. For thoroughness, however, we briefly review the trial court's reasoning for making the findings that it made.

For substance abuse, the court observed that respondent-father had 39 noncompliant results that included testing positive for alcohol on multiple occasions. The court noted that respondent-father did not appear to have issues with other substances—only alcohol. But the court emphasized that respondent-father's issues with alcohol were severe, as demonstrated by his testing positive for alcohol at a court hearing in August 2025. Respondent-father also admitted to drinking alcohol "the day before the last hearing," and at the time of the termination trial, he was "in jail again for alcohol issues." The court accordingly found that respondent was continuing to abuse alcohol at the time of the termination hearing.

Respondent-father's mental health issues—another of respondent-father's barriers to reunification—were to some extent tied to his alcohol abuse; the result of respondent-father's psychological evaluation recommended that he participate in inpatient treatment "to safely detox." The court observed that respondent-father had not done this, nor had he engaged in any "outpatient substance abuse counseling" to help him achieve sobriety. The court further noted that respondent-father had largely not complied with any other recommendation from his psychological evaluation—it was recommended that respondent-father engage in "mental health counseling" but the court was unable to confirm what, if any, type of counseling respondent-father had engaged in; it was recommended that respondent-father "follow up with a psychiatric provider" but there was no evidence that he had done so; and it was recommended that respondent-father get help addressing "his extensive history of domestic violence," which he had not done.

This bled into the trial court's finding that domestic violence remained a barrier to reunification for respondent-father. The court observed that respondent-father's history of domestic violence included "[f]ive domestic violence convictions . . . over the history of his life." The court noted that one of his recent domestic-violence convictions carried with it a no-contact order with respondent-mother, but respondent-father violated that order "on a regular basis." Respondent-father's contact with respondent-mother while this case was ongoing led to three instances of domestic violence documented by the police—two in March 2025 and a third in August 2025. Considering this history, the court concluded that respondent-father's struggles with domestic violence remained unresolved.

As for housing, the court found that respondent still did "not have any safe housing." Respondent-father admitted that the current house he lived in was "not appropriate" for SMR. The court also observed that respondent-father lived a transient life as he sometimes lived with his parents and other times, for reasons unknown, "live[d] in a tent." The court found that this did not constitute "stable housing by any stretch of the imagination" and concluded that because it had been ongoing "for ten months now," housing remained a barrier to reunification.

On appeal, respondent-father argues that the trial court clearly erred by finding that respondent-father could not rectify his barriers to reunification within a reasonable time

-7-

considering SMR's age. The trial court reasoned that respondent-father could not rectify his barriers to reunification within a reasonable time because, in the 10 months since this case began, respondent-father had not made any meaningful progress on addressing any of his issues. The court did not believe that "[t]he mere possibility" that respondent-father could "radical[ly] change" was enough to find a reasonable probability that respondent-father could rectify his barriers to reunification within a reasonable time.

Respondent-father emphasizes that he complied with some aspects of his case service plan, such as completing parenting classes and a psychological evaluation, attending most parenting-time sessions, and testing negative on some drug screenings. While that is true, the trial court found that respondent-father had not benefited from any of the services he completed, so his participation did little to rectify his barriers to reunification. The prospect that respondent-father may participate in more services in the future is hardly a basis to conclude that he may rectify his barriers to reunification if he continues to not benefit from the (few) services in which he engages. Respondent-father also offers excuses for his ongoing struggles with housing and substance abuse, but we cannot fault the trial court for not crediting those excuses when respondent-father refused to engage in any of the services offered to him to help address his ongoing issues with housing and substance abuse.

On this record, we conclude that the trial court did not clearly err by finding that termination of respondent-father's parental rights was proper under MCL 712A.19b(3)(c)(*i*). More than 182 days had elapsed since respondent-father's initial dispositional order was issued, and the trial court did not clearly err by finding that (1) the conditions that led to adjudication (housing, domestic violence, substance abuse, and mental-health concerns) continued to exist and (2) there was not a reasonable likelihood that respondent-father would be able to rectify these barriers to reunification in a reasonable time considering SMR's young age.

Having concluded that termination was proper under MCL 712A.19b(3)(c)(*i*), we need not address the other statutory grounds on which the trial court relied to terminate respondent-father's parental rights.

## III. BEST INTERESTS

Respondents next each contest the trial court's finding that termination of their parental rights was in SMR's best interests.

### A. STANDARD OF REVIEW

Once a trial court has determined that a statutory ground for termination has been proven by clear and convincing evidence, it must decide by a preponderance of the evidence whether termination is in the child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). A trial court's best-interests determination is reviewed for clear error. *Id*.

### B. APPLICABLE LAW

The best-interests analysis is focused on the child, not the parent. *In re Moss*, 301 Mich App 76, 87-88; 836 NW2d 182 (2013). To determine the child's best interests, the court should

weigh all available evidence and consider a variety of factors. *In re White*, 303 Mich App at 713. Relevant factors include the parent-child bond, the parent's history of attending parenting time, the parent's parenting ability, advantages of the caregivers' home in relation to the parent's home, and the children's need for permanence and stability. *Id*. at 713-714. Continued engagement in domestic violence is also a possible consideration, as is the parent's "visitation history, the parent's engaging in questionable relationships, the parent's compliance with treatment plans, the child's well-being in care, and the possibility of adoption." *In re Sanborn*, 337 Mich App at 277.

## C. RESPONDENT-MOTHER

Ample evidence supported the trial court's finding that termination of respondent-mother's parental rights was in SMR's best interests. SMR came into care after he was left outside in the middle of winter while respondent-mother and respondent-father were involved in a domestic-violence altercation. Despite being offered services to develop skills to better handle domestic-violence situations, respondent-mother continued to place herself in such situations by continuing to engage with respondent-father. More than that, respondent-mother engaged in domestic violence and was arrested for her conduct in August 2025—eight months after SMR was removed from her care. As for compliance with her treatment plan more generally, respondent-mother engaged in some of the services offered, but as explained earlier, she did not benefit from that engagement, so her barriers to reunification remained. The trial court also emphasized how SMR was thriving in his current placement and how his caregivers were open to the possibility of adoption, which weighed in favor of finding that termination was in SMR's best interests. Termination also offered SMR a chance at permanence, stability, and finality because he would not have to stay—in the trial court's words—"in the limbo" that he had been in while respondent-mother's case was ongoing. All of these factors supported the trial court's finding that termination of respondent-mother's parental rights was in SMR's best interests.

Respondent-mother contends that the trial court clearly erred by finding that termination of her parental rights was in SMR's best interests because the court did not place adequate weight on her bond with SMR, the court discounted respondent-mother's progress towards providing a safe home environment for SMR, and the court improperly compared respondent-mother to SMR's foster placement. Starting with respondent-mother's bond with SMR, the strength of that bond was questionable, and the trial court did not clearly err by finding that termination was in SMR's best interests for all of the reasons explained above despite there being some type of bond between respondent-mother and SMR. As for the trial court purportedly discounting respondent-mother's progress, we do not read the trial court's decision as insufficiently crediting respondent-mother's progress. The court merely observed that respondent-mother had only recently made progress towards addressing the barriers to reunification. That was appropriate because the court was tasked with considering whether SMR should remain in "limbo" waiting to see if respondent-mother could progress to the point that she could safely reunite with SMR or if it was time to consider an alternative permanent placement for SMR. Lastly, as for comparing the advantages of SMR's foster placement to respondent-mother's home, we believe that, in context, the trial court was not intending to simply compare the homes but instead observing how SMR had thrived in his foster

placement as compared to when he was in respondent-mother's care.[3] SMR came into foster care behind on many of his developmental milestones, and through the efforts of his foster placement, the child had made significant progress towards achieving those milestones. How SMR fared in his foster placement is obviously an appropriate consideration for a best-interest analysis because the analysis is focused on the child.

In the end, we cannot conclude that, on the facts of this case, the trial court clearly erred when it found by a preponderance of the evidence that termination of respondent-mother's parental rights was in SMR's best interests.

## D. RESPONDENT-FATHER

As with respondent-mother, ample evidence supported that termination of respondent-father's parental rights was in SMR's best interests. SMR came into care after he was left outside in the middle of winter while respondent-mother and respondent-father were involved in a domestic-violence altercation. Respondent-father continued struggling not only with refraining from domestic violence but following the terms of his probation, which included a no-contact order with respondent-mother and abstaining from alcohol. Respondent-father's inability to adhere to

---

[3] Respondent-mother relies on the following statement from *Fritts v Krugh*, 354 Mich 97, 115; 92 NW2d 604 (1958), overruled in part on other grounds by *In re Hatcher*, 443 Mich 426; 505 NW2d 834 (1993), in support of her argument: "It is totally inappropriate to weigh the advantages of a foster home against the home of the natural and legal parents." When the *Fritts* Court made this statement, it was discussing the statutory standard for taking jurisdiction over a minor child. See *id*. at 112-115. And it was in that context that the Court explained that a trial court could not find that a parent was neglecting their child because a foster home could offer "advantages" that the parent's home could not. *Id*. at 115. Trial courts must instead assess evidence of neglect using "statutory standards." *Id*. at 115.

In *In re JK*, 468 Mich 202, 215 n 21; 661 NW2d 216 (2003), our Supreme Court extended *Fritts*'s rule and clarified that the type of "improper comparisons" discussed in *Fritts* could not be discussed when a trial court was deciding whether there existed a statutory ground to terminate a respondent's parental rights. That is, a trial court cannot consider the possible "advantages" of a foster placement over a respondent's home when deciding whether there exists a statutory ground for termination. But later, in *In re Rood*, 483 Mich 73, 117 n 53; 763 NW2d 587 (2009) (Opinion by CORRIGAN, J.), the lead opinion suggested that it was proper for a court to "reach[] the question whether [a minor child's] best interests were better served by her foster family" so long as the court "first properly [finds] grounds to terminate [the] respondent's rights." That is, the lead opinion in *In re Rood* suggested that the type of analysis prohibited by *Fritts* did not apply to a trial court's best-interest analysis. Consistent with this analysis, and as noted above, this Court has repeatedly recognized a court's best-interest assessment may consider "the advantages of a foster home over a parent's home." *In re White*, 303 Mich App at 713 (quotation marks and citation omitted). See also e.g., *In re Foster*, 285 Mich App 630, 634-635; 776 NW2d 415 (2009) (recognizing this proposition and explaining that *Fritts* does not require otherwise). Respondent-mother does not acknowledge this authority or explain why the court's analysis was improper despite it.

his probation conditions resulted in his returning to jail for a time. Respondent-father also continued struggling with alcohol throughout the pendency of this case, which included an incident in August 2025 in which respondent-father came to court inebriated. There was also the issue of respondent-father's inappropriate housing—respondent-father vacillated between living with his parents and living in a tent, and neither living arrangement was suitable for SMR. In addition, as recognized earlier, the trial court emphasized how SMR was thriving in his current foster placement and how his caregivers were open to the possibility of adoption, which were factors that weighed in favor of finding that termination was in SMR's best interests. Termination of respondent-father's parental rights and the possibility that SMR could receive a permanent placement also supported termination because it offered SMR the chance at permanence, stability, and finality, which he needed and that respondent-father had not shown the ability to provide. All of these factors supported the trial court's finding that termination of respondent-father's parental rights was in SMR's best interests.

In the face of this evidence, respondent-father contends that his rights should not have been terminated because he loved and was bonded with SMR, he had quality visits with SMR, and his compliance with his treatment plan was improving. We do not question respondent-father's love for SMR, but that alone does not demonstrate whether and to what extent SMR was bonded to him, and there was record evidence that this bond, while existent, was not especially strong. And while respondent-father may have had quality visits with SMR, he had not demonstrated the ability to safely parent SMR, so those visits remained supervised. In addition, to any extent that respondent-father's compliance with his treatment plan may have been improving (which is debatable), this case had been outstanding for 10 months by the time of the termination trial, and respondent-father had made virtually no progress towards rectifying his barriers to reunification, as explained earlier. In the face of all of the evidence that supported that termination was in SMR's best interests, respondent-father's bond with SMR did not render clearly erroneous the trial court's finding that termination of respondent-father's parental rights was in SMR's best interests.

Affirmed.

/s/ Philip P. Mariani
/s/ Colleen A. O'Brien
/s/ Randy J. Wallace